Good morning. May it please the court. My name is Chris Pickett. I represent the appellant James C. Smith in the consolidated appeal that we are arguing before you today. I hope to present an argument on three points. Two from the consolidated appeal, one from Mr. Smith's individual appeal. The first is that the district court erred by denying the appellant's motions for judgment of acquittal because the government presented insufficient evidence that the predicate acts constituted a pattern as required by the RICO statute. As set out fully in the brief and has been the law for some period of time, the Supreme Court in H.J. Inc. has set out that predicate acts are more, or a pattern is more than just the number of the acts. They have to be related. And they have to be related to each other, that is horizontally, and vertically, that is up to the enterprise. And if they are not related, then it is not a pattern. And the reason is, and this dates back to 1998, United States Circuit, and cases since then, that RICO was not meant to cover groups of individuals committing isolated or sporadic criminal acts. The purpose of RICO was to stop organized crime or some form of organized crime committing a pattern of criminal acts. And here, it is clear that the predicate acts that the government complained of, alleged in the indictment, and for which the evidence was adduced, they were isolated and they were spontaneous. Isolated means separate from others, happening just once, happening in different places. Sporadic is happening often, but not regularly. And that is what happened here in this case. Beginning in May of 2009 with Mr. Petit, and continuing through March of 2011, the incidents that the government complained of were isolated and sporadic. They did not have the same participants, they did not have the same victims, and they did not have the same reason for the commission of those offenses. In fact, many of them were investigated by state authorities, and they were investigated by state authorities because that is what they were. They were individual state crimes. They were crimes that occurred at a Bennigan's in Gary, Indiana, because Mr. Petit was upset personally at Robert Taylor. Well, was it the informant that tied it all together? The informant was able to say that all of these members were with the Wheels of Soul. That certainly is true. But being a part of a group does not automatically make them related to the enterprise. Well, how much did the informant know about all the various incidents? Much of what he knew, so as it relates to Mr. Petit's situation in May of 2009, a lot of that was hearsay. In August of 2009, the incident that occurred here in the city of St. Louis, he had more direct information because he was in the city of St. Louis. He knew what happened. As it relates to January 2, 2011 in Chicago, again it was hearsay. He heard from Mr. Robinson. He heard from other people what he believed to have occurred. And so the informant tried to tie it all together certainly for the government, but the informant failed because the evidence failed, frankly, because the government didn't tie it together. They didn't show that what Mr. Petit did was because of or related to the Wheels of Soul. They didn't show that Mr. Robinson's conduct on January 2, 2011 was related to the Wheels of Soul. The January 2 example is a good one. There's an argument about whether Mr. Irvin can wear a vest with a rocker on it, the state rocker. Mr. Robinson was told by Mr. Alan Hunter, another government witness who testified significantly throughout this trial, not to do anything. And Mr. Irvin started the gunfight. This was spontaneous, and Mr. Hunter testified to that fact. This was a spontaneous event. The March 2011 spontaneous event. These were not related, and they were clearly not related. And in fact, Mr. Hunter testified that these acts were unrelated. He testified that they were spontaneous. And frankly, Mr. Hunter was in the best position to know as the regional president. The second issue that I want to discuss briefly with the court is the district court's abuse of discretion in not utilizing a special verdict director. And this was raised in the joint brief, and it was also raised in Mr. Smith's individual brief. The defendants requested what was, for the record, as Smith proposed A and Smith proposed B. And A and B would have required the jury to effectively determine which predicate acts, or to which predicate acts the defendants agreed would be committed. The court ultimately used a general verdict director, indicating that the jury had defined the defendants knew and intended that a co-conspirator would commit two predicate acts. We asked for the verdict director because this was a complex case with hundreds of witnesses, hours and hours of testimony, hours and hours of tapes. And ultimately, that underlying point that for Mr. Smith specifically, but certainly for Mr. Elkins, Mr. Frye, and some of the other defendants, that element and that issue was very real. The instruction number 26 specifically said the jury had defined that the defendants knew and intended that a co-conspirator, either themselves or another co-conspirator, would commit two predicate acts. And this verdict director would have been proper in this case. And we, the appellants, understand that the law says that it's abuse of discretion and that there is no bright line rule. And there is no bright line rule, but that does not mean that this court cannot reverse and cannot require use of a special verdict director in the facts and circumstances of this case. And that dovetails into the And that is that the district court erred when denying Mr. Smith's individual motion for judgment of acquittal because he did not have the requisite knowledge that a co-conspirator would commit two predicate acts. Instruction 26 made it clear what the government was required to prove, that Mr. Smith knew and intended that a co-conspirator, co-conspirator, would commit two predicate acts. Here in this case, and the government's brief sets this out beautifully, he didn't know. They know he had no advanced knowledge. They concede that point. The government's argument is he should have known, he would have known, he could have known, he undoubtedly knew, he likely authorized. That is not evidence sufficient enough to sustain a conviction for violation of the RICO conspiracy statute. What about his edicts? He seems like he's the leader when the group gets together and is expressing the goals of the organization. Could a jury infer from that, given the directives that he gave the other folks, that he knew some of these predicate acts would be taking place? I would suggest that the answer to that question is no. And the reason why is that there were no actions taken as a result. Mr. Hunter testified that even if he believed there was a war, there was no war. There was no action taken. There was nothing done. And United States v. Posada-Rios, a 5th Circuit case from 1998, says that even if we agree to do something, if nothing happens, there's no conspiracy. And that's what occurred here as it related to Mr. Smith. To the extent he spoke, and to the extent he made edicts, those edicts resulted in no action, and therefore cannot be used as a basis to sustain the conviction. So it's your position that his directives did not result in any of the actions that were alleged in the indictment and ultimately proved up at trial? That's absolutely right. And that works with the argument made previously. These were spontaneous events. These were not people that were listening to Mr. Smith. And in fact, the evidence was clear that many times, and the testimony was that they did not listen to Mr. Smith. Mr. Hunter did what he wanted, when he wanted, how he wanted. So his defense is he's an ineffectual leader. They're not doing what he tells them to do. That might be the defense, but I believe that in that circumstance, that does not make him criminally liable for violation of the RICO conspiracy statute. That's all the time that I have. Thank you. Thank you. Mr. Jenkins. May it please the Court, I'm Ronald Jenkins on behalf of Jerry Elkins, and I will be addressing the Court with respect to the territorial jurisdiction of the wiretap issue on behalf of the appellants. The government, in its brief at page 167, sets forth this particular issue in a very narrow form, and it is the proper issue before the Court. Does the District Court have the authority to issue a wiretap order on a telephone, outside its jurisdiction, simply because of the, quote, listening post rule? That's the government's quote, listening post rule. This Court, and I'm sure you have, could look at Title III, 2510 et cetera. You can look at the legislative history. You can look at the federal rules, 41 or any other rule, and you could look at the order in this case, which is Addendum 1 through 5, and in particular, Addendum page 5 of our joint appendix. You will not see listening post rule in any of those contexts. Actually, Judge Meskel, in the Rodriguez case, quoted by everyone, in his dissent, says, sooner or later, we're going to reach a point where the crime is in New York, the phone is in New York, the defendant is in New York, and the government is going to choose to put the listening post in Nome, Alaska. Then we're going to have to justify why the government can choose jurisdiction in Nome, Alaska, for something that happened in New York. Now, Judge Meskel's opinion, actually, was not a dissent, as I recall. It was a concurrence in the judgment, and he said he disagreed with the majority's view, but he would hold that the evidence in that case was admissible because the government reasonably relied on the order. It was a good faith exception. That is correct, Judge, and let me . . . So why, even if all of what you say is correct, why wouldn't the evidence come in here on the same basis that Judge Meskel suggested in that case? I would suggest to you that Glover must be considered, and Judge Silberman, in the Glover opinion, which was just published and is in our brief, finds that 251810A requires . . . there's no judicial discretion. It requires . . . the word is shall be suppressed, and I believe, even though Judge Silberman refers to a bug in a vehicle, I acknowledge that, but it's the same law, Judge Carlton, 2518, it's the same Title III. Yes, but there might be Eighth Circuit law on that question. Isn't there some Eighth Circuit law applying Leon? Not with respect to a Title III, to my knowledge, Judge. Well, you might . . . I'm not sure you're right about that, but we can research it. Okay. Whether it is 25A10, parenthesis, little I, or parenthesis, little II, the verbiage cited is, it shall be suppressed, and that's our position. The judge . . . take a little time, if I may, what little I have left. A couple of these cases that are cited for the, quote, listening post rule, each of these situations are bordering jurisdictions. In other words, let's take Ramirez. The fellow lived in Wisconsin. He sold dope in St. Paul, Minnesota, and he took his cell phone back and forth from his house to St. Paul, Minnesota, and he used the cell phone in both Wisconsin and St. Paul, Minnesota as he conducted his business. The phone was directly tied to the criminal activity and the jurisdiction. This order says, if the target telephone is transferred outside the jurisdiction of this court, Judge Autry, then the interception shall continue. That infers or implies that the telephone was at some point in the Eastern District of Missouri, and that is not true, and you can find that at docket 648, pages 79 to 85. The phone was always in Chicago. Mr. Hunter was always in Chicago. The conversations occurred while he was in Chicago. It was never in the Eastern District of Missouri. My time is up. Thank you. Thank you. Mr. Woods. Good morning, Judge. I'm sitting here waiting for the clock to recycle, but good morning. It's good to be here in front of you all. My name is David Woods, and I represent Mr. Jerry Petit. Well, should I go ahead and start or are you cycling? It's going. It's going. Very good. To be convicted, Mr. Petit had to be associated with an enterprise. It had to be interstate. It had to be through a pattern of racketeering activities in order to be convicted under 18 U.S.C. 1962D. A pattern of racketeering activities is two, says the statute. Two predicate convictions. Salinas, S-A-L-I-N-S, versus United States controls. I want to read a little bit about Salinas. In the case before us, even though Salinas, and that's a deputy, did not agree or accept two bribes, there's committed two acts of racketeering when he accepted bribes, and that Salinas knew about and agreed to facilitate the scheme. Mr. Petit was only convicted of one predicate act, attempted murder to be done to facilitate a racketeering activity. He was not convicted of attempting to tamper with a witness. All right. You only have one predicate act, so where does Salinas tell us to go? There has to be sufficient evidence to show that somebody facilitated the scheme. The government says the scheme started with shooting Robert Taylor in Gary, Indiana. However, that's not the testimony of Alan Hunter from volume 19, page 46. It was a spontaneous incident. That's not the testimony from Sean Jackson, another government witness. Volume 2, page 148. He received information after the shooting. So what did Mr. Petit actually do? Well, I recite the incidents that the government talks about where all these various individual and sporadic incidents. Mr. Petit is not there. I didn't try this lawsuit, so I'm reading it fresh like you all are, the cold, sterile transcript. And I keep looking for places where it says Mr. Petit did something. Well, Mr. Petit was there in Gary, Indiana. He's gone for maybe another year until he's told to leave a meeting in Chicago, and then he doesn't appear at all the alleged beatings, shootings, taking away people's patches. He's just not there. So he didn't, and he didn't give any orders to anybody. Just because he's the president, I used to be the president of my Gideon's chapter, and just because I gave orders or had meetings as a president didn't mean people were doing what I told them to do. And I don't think you can say just because Mr. Petit was the president two weeks before May, two weeks before Gary, Indiana, that he was an organizer. What does the record reveal about the president of this group? Well, if you listen to Kennedy Petit, now that's the brother of Jerry, talking about, yes, the president tells us to do things, but I think Kennedy said that doesn't mean we have to. And apparently there in the Gary, there were seven men that were supposed members, and I think they had to have more than that to actually be a chapter. See, the evidence doesn't talk about a meeting was held on such and such date. A meeting was held on such and such date. These people attended, and this is what was said. And Jerry is not in any of these meetings. I want to take 20 seconds to say that, again, there was no evidence that Jerry conspired with anybody to promote the so-called prestige of Wheels of Soul. Okay, your time is up. My time is up. Judge, I appreciate you letting me speak in behalf of Mr. Petit today. Thank you, Your Honor. Mr. Roller. Good morning, Your Honors. Douglas Roller on behalf of the defendant Robinson. Robinson's got some bad evidence. Well, it is bad evidence, but in a different context that I think you're referring to. And I plan to discuss primarily by the time I have counts 10 and 14, which are the two murder counts, felony murder in count 10 in Chicago in January of 2011, and the first-degree murder in March. There is one overriding error in the court's denial of motion for judgment of acquittal as to both counts. And that is both counts constituted a violation, or alleged a violation, of 18 U.S.C. 1959. And that requires that the criminal underlying criminal act be done for the purpose of maintaining or increasing the defendant's position in the enterprise. Now, the district court gave an instruction with language that the government is not required to prove that the defendant's sole or principal motive was maintaining or increasing his position, so long as it proves maintaining or increasing his position was among his purposes. Now, this is consistent with United States v. Fairchild in this circuit, and is consistent with the majority of the cases talking about the meaning of maintaining or increasing. The government requested additional language. They wanted the judge to put in the instruction, the motive requirement is satisfied if the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise. This actually dovetails into what Mr. Pickett was talking about in terms of isolated incidents, the only connection being that the individuals happened to all belong to the Wheels of Soul. The district court rejected that language, said no. In closing argument, the government prosecutor argued that the language only requires this jury to find that these offenses, the underlying crimes, were committed by reason of the defendant's involvement in the enterprise charged in the indictment. The prosecutor went on to say basically it was sufficient for the government to prove that the defendants were beholden, obligated, or expected to commit these acts by reason of their involvement in the enterprise. Directly contrary to the judge's instruction, directly contrary, or in conflict with United States v. Fairchild. But, here's where it really gets bad, is the prosecutor only took only talked about that element for a couple paragraphs in the transcript. Did not mention one defendant. Did not parcel on any facts as each defendant. Isn't this a sufficiency question? Aren't you arguing insufficient evidence? Insufficient evidence, yes. Okay, well the closing argument doesn't have to recount all of the evidence. No, it does not. But when she does not refer to the evidence, your honor, she is telling the jury this is what the law is. And that is the error. She was telling them. Well, did you object? Did you object to the final argument? Yes, I did. And I moved for a mistrial. I was denied. The judge said she did not misstate the law? The judge just denied the motion without comment. Now, what's exactly the misstatement of the law? To say that someone... Just his involvement in the enterprise. And what you might think was expected of him because he was a member of the enterprise. Why isn't that the same as maintaining his position in the enterprise? To do what's expected of him. Why isn't that equivalent to maintaining his position in? Because from my reading of the research, your honor, that is not the law, of a defendant. Every one of those cases deal with a kingpin of a cartel, or a mafia boss, or somebody else who is a leader and has to, is expected to perform to protect the leadership. That's where that comes in. If I may turn... Did he have a particular title? Well, he was called the sergeant at arms. Mainly that required him to only make sure people didn't have guns and there was... At the meetings. And that there was order in the meetings. The government called him an enforcer. That title, however, in the wheels of Seoul, related to when they were on motorcycles. That was a particular position and that was not him. All right. And getting to your question, with a few minutes I have left, your honor, is that on January 2nd, the only evidence, the only evidence of robbery came from Irvin. Tonya Mays, Andrea Smith, Charles Davis, all testified that they heard no threats and saw no guns until Irvin pulled his out. Dave was a friend of Irvin's. He said he saw no guns and heard no threats. Now, the government in their brief that Davis testified that the wheels of Seoul members approached Irvin, quote, demanding his vest. Not true. What Irvin testified to... Isn't there some commonality of these victims in that the aggression is against rival clubs or organizations or motorcycle groups? Well, in this case, the person was part of another motorcycle club. In Ohio, these people were not members of any other motorcycle club. The best thing that was heard was that they were members of a street gang. There was no competition there. That was not true for March. But it's true for January? It's true that this guy was from another motorcycle club. But what is important here is no one ever said they were going to take his vest. Davis testified that they said, take off your vest. And in our brief, we explain why that's important. And it goes back to a prior confrontation between Irvin and Alan Hunter. So you have no one. So what does Irvin say about taking his vest? Irvin testified in cross-examination that he didn't hear anyone say that they were going to take the vest away from him. There's no evidence, not only insufficient, there's no evidence of robbery. None. And that is what is required in order to have a felony murder conviction. There was no evidence. The government says, now Irvin went on to talk about the defendant and Cole having guns. Well, he's the only one that testified to that. And the government says, hey, you have to believe him. You can't parcel out who's credible and who isn't. Well, that's simply not true. That is not the law under Crenshaw. In addition, the forensic evidence, and we talk about this in the brief, shows that what Irvin testified to was, in fact, impossible. All the shells that were related to what he was talking about were by the front door, way across the clubhouse from the bar. So it could not have gone down like he said. In addition, he said... Did he have a title in the group? In Chicago, he was, as I indicated, he was called the Sergeant of Arms for a while. But, interestingly enough, that was taken away from him after the January incident. So when March came along, no, he did not have a title in the organization. I see my time is up. March 6th, the government failed to prove beyond a reasonable doubt that he was not acting in self-defense. Thank you. Could you identify yourself for the record? I certainly will, Your Honor. My name is Serena Miller-Whistler. I'm privileged today to represent the United States of America in this appeal by appellants Dominic Henley and others related to the government's prosecution of them for racketeering conspiracy and other charges. Myself and my colleague, Mr. Delworth, represented the government at all serving as trial counsel. For continuity's sake, I would like to address the issues in the order addressed by the appellants and in which they appear in the government's brief, beginning with Mr. Pickett's argument relative to the pattern of racketeering element of the conspiracy. Your Honors, it's abundantly clear that the parties are in agreement that based on H.J. Inc. and other cases, the government was obligated to prove as part of the racketeering conspiracy that the appellants conspired to conduct the affairs of a racketeering enterprise through the pattern of racketeering activity. The government's position as it set forth in our brief is that the government presented more than sufficient evidence with respect to that element of the offense. The government was obligated to prove by way of the pattern of racketeering activity that the charged racketeering acts were related to each other horizontally and vertically. It's important to note, however, that a number of circuits have previously held, as has the Supreme Court, that the government can prove horizontal and vertical relatedness by way of the same evidence. In other words, if the government is able to prove that each of the predicate acts is related to the affairs of the enterprise itself, those acts are both horizontally and vertically related. It's the government's position that the evidence at trial demonstrated unequivocally that the acts charged in the indictment and as proven at trial were all related to the enterprise that was charged in the indictment. What about your own witnesses who say that nobody planned that? That just happened? Your Honor, I think the appellants are reading into the racketeering statute and the case law, interpreting it an element that simply does not exist. And that is an element of premeditation. There simply is no case in any circuit or in the Supreme Court that suggests that any of these acts need to be planned in advance. To the extent that these acts occurred spontaneously, the government doesn't dispute that that was the case. However, the government was not obligated to prove that these activities were planned in advance or that they were at all premeditated. So the government suggests that the notion of spontaneity is simply something that doesn't exist in either the statute or the case law. With respect to the sporadic nature that's been alleged, the government could not disagree more with the appellant's characterization of the government's evidence. It seems pretty clear based upon the evidence at trial, which of course took some six weeks and encompassed about 4,700 pages of trial testimony, that these acts began in May of 2009 with the shooting in Gary, Indiana that's been previously discussed and didn't end until March 6th of 2011. And those acts occurred on a regular basis during the entire course of that period of time. What's important to note, your honors, is that a number of the originally charged defendants in this matter entered guilty pleas. So obviously the government did not present all of its evidence at trial, rather it presented evidence only as to the eight defendants who proceeded to trial. But the testimony at trial included things like drug dealing that occurred between other co-defendants and the government's informant in this case. Now obviously those acts are not directly attributable to these appellants. However, the jury was free to consider those acts as part of the pattern of racketeering activity. Based on that evidence- Would you ever have been able to make this case without the informant? It would certainly have been much more challenging, your honor. However, given the number of former members of the Wheels of Soul that testified at trial and the number of recorded conversations that were played, both judicially authorized wiretap conversations and consensually recorded conversations. It's the government's position that this case could have been proven beyond a reasonable doubt without the informant. It certainly would have been much more challenging, but I don't believe it would have been impossible, particularly in light of the- Did you get the wiretap authorization before you had the informant? We got the wiretap authorization after we had the informant. And in fact, the informant provided the consensually recorded calls that ultimately resulted in us acquiring the judicial authorization for the wiretap. Mr. Pickett suggests on behalf of Appellant James Smith and others that the government failed to prove that these activities were related to each other. And alleges that the evidence failed to show that they had the same or similar participants or victims. And points to the fact that these, in many cases, these events were investigated by state authorities. Once again, the government could not disagree more with that characterization of the evidence. First of all, it's important to note that the case law suggests that they have to have the same or similar participants. Obviously, all of these acts occurred in situations in which one or more members of, well, more than one of these members of Wheels of Soul and this enterprise work together. None of these incidents occurred when any one of these people was alone. All of the incidents occurred when these people were present together in groups, and more importantly, occurred when they were present together in groups and wearing the vests that identified them as members of the Wheels of Soul. These were not isolated incidents of domestic violence, or road rage, or any sort of property crime that occurred when any one of these appellants was alone. To the contrary, they occurred only when the appellants were together in groups of two or more. And I think that's a critical fact that the court should consider. With respect to the similarity of victims, obviously, these offenses can't have the same victims, because to the extent that some of them were murders, someone can only be victimized once. But certainly, as the court has pointed out, and I believe it was Judge Kelly who asked the question with regard to the victims and whether or not they were related to each other in terms of membership in organizations. With the exception of the victim in the Marion, Ohio incident in March 6th of 2011, all of these victims were members of either motorcycle clubs or social clubs that were similar in the sense that they all wore insignia or vests that identified themselves as members. The government, I believe, has set forth the evidence in its brief with regard to the similarity of the participants and victims, and so I won't belabor that point. With respect to the evidence that was provided by the informant in this case, who indeed tied the offenses together, Mr. Pickett characterized that evidence as hearsay. Well, in the government's view, that evidence was most definitely not hearsay. In fact, it was definitionally not hearsay, in the sense that Mr. Hunter, the informant, testified to a number of statements, in fact, a vast number of statements that were made by the co-conspirators. Those co-conspirator statements were admitted at trial as non-hearsay and came in as substantive evidence. So to suggest that that evidence was hearsay is simply not true. Moreover, Mr. Hunter was physically present during a number of these incidents, including the incident in St. Louis and also the incident in Marion, Ohio. In addition to that, your honors, there were a number of occasions in which Mr. Hunter was able to make recorded conversations in which these appellants themselves discussed those incidents. Why was this case charged in St. Louis? Your honor, this case was charged in St. Louis because the investigation began after the armed robbery. Well, the investigation was ongoing at the time of the armed robbery that had occurred in St. Louis on August 10th of 2009. That was the armed robbery in which Mr. Henley and his co-defendant, Mr. Ball, were involved, in which they robbed two members of the STL riders of their vests. That incident is really what sort of generated the federal government's, the investigation was ongoing prior to that in some respects, but we actually learned about the Gary, Indiana incident after it occurred by way of the recorded conversation that was made by the government's informant. That was the meeting at which the informant was present when Mr. Henley talked about the shooting in Gary, Indiana. And it's important to note that during that same conversation, he talked about the fact that the situation had created issues between the Sin City disciples and the Wheels of Soul. And in fact, he testified in response to that incident that he had been instructed by national leadership to start stealing patches from members of the Sin City disciples. So the case was charged in St. Louis primarily, Your Honor, because we had the investigative resources and quite frankly, a task force officer who investigated the case probably better than anybody else could have done it. And so it was really because of the informant's location, the incident that occurred on August 10th, and then the shooting incident that occurred on August 15th, that the federal government made a decision to stop the stealing activity from here in St. Louis. And you're going to address the Title III question? Certainly, Your Honor. So is the defendant correct that the government's position is that this wiretap order could have been obtained anywhere that the government set up a listening post? Yes, Your Honor. And I do- There's no restriction on that. You could have chosen Alaska. Hypothetically, you could have chosen any district in the country. There's no requirement of any nexus to the phone. Your Honor, the case law that's been cited in the government's brief- I know the case. Well, go ahead. But yes, it's the government's position that so long as either the device or the listening post is located in the jurisdiction in which the district judge is located, that district judge enjoys jurisdiction to authorize that wiretap. That is based on a statutory interpretation of the appropriate wiretap statute. And it's based on the definition of intercept, which is defined as the oral or other acquisition of the contents of any wire, electronic, or oral communication. And the cases that the government have cited in its brief from a number of circuits indicate that based upon that language, the interception can be acquired in more than one location. It's either acquired at the location of the handset or it's acquired when it's first overheard by the monitoring personnel, which in this instance would be in St. Louis. So yes, it's the government's position that the wiretap could have been authorized by any district judge in any jurisdiction in which the listening post was located. I want to take a moment- And that's really the situation here. There was no connection to St. Louis with the phones. I mean, there's no practical difference here between Alaska and St. Louis, is that right? Or do you say that there's some factual difference? No, I think there's some factual distinction there, and I think it's a significant factual distinction. And that is that the government certainly demonstrated that during the course of this wiretap, Mr. Hunter, Alan Hunter, whose telephone we were monitoring, was making telephone calls from Chicago to St. Louis. And I want to specifically mention the incident that occurred relative to the conspiracy to commit murder in East St. Louis. That incident was largely captured over the Title III wiretap. But the phone was never in St. Louis. The phone, the government did not deduce any evidence that the physical device was ever located in the Eastern District of Missouri during the course of the period of authorization. While we're on the subject of the- Just one more question on that. What case do you think of the ones you've mentioned is factually on point, where the phone was never in the jurisdiction where the order was obtained? Well, Your Honor, I think the Ramirez case out of the Seventh Circuit is perhaps the most interesting, because among other things, the Ramirez case suggests that it wouldn't have mattered if the phone was never in the district. And the Ramirez case, which was decided in 1997, suggests it is not certain that the phone in issue was transferred outside the Western District of Wisconsin, it may never have been there. But we do not read the order as limited to the case in which the phone was at some time in the district. So Judge Posner in the Ramirez case actually suggests very strongly that wouldn't have mattered whether the phone was ever in the district or not. A number of the cases that were cited by the appellants include instances, as Mr. Jenkins noted, in which the phone and the listening post were located in contiguous districts. Or there's an attempt made to make a factual distinction between the cases that the government has cited and others. However, none of those cases turn on those facts. In other words, none of the cases ever say the only reason that we're holding that this wiretap authorization was valid was because the phone and the listening post were located in contiguous districts. So those factual distinctions are really irrelevant to the analysis. The fact of the matter is that all of the circuit courts of appeals that have decided this issue have decided it in the government's favor. And the appellants have not provided this court with any case from any jurisdiction in which a listening post in the vernacular authorization was found to be insufficient. While we're on this subject, I want to address the Glover argument. As the court is well aware, the Glover case was decided just recently by the DC circuit. And to the extent that the appellants rely on the Glover case for their listening post argument, it's the government's view that their reliance is completely misplaced. And I think really that the argument comes down to a relatively simplistic one. And that is that if one reads Glover for its actual facts and for its actual holding, what the Glover court says is that the issue in Glover relates to the authorization for a covert trespass re-entry onto private property. This case does not involve a covert trespass re-entry onto private property. And in fact, Judge Posner in the Ramirez case takes pains to point out that a Title III wiretap, unlike some of these other listening devices, is factually distinct. In the sense that a Title III wiretap does not implicate a trespass re-entry at all. We don't install a physical device on a handset to conduct a Title III wiretap. Rather, it's all done by sort of mechanical means. So I think it's important to note that Glover is limited to its facts, which are relative to a covert trespass re-entry onto private property, which we simply don't have here. The other interesting thing about Glover is that the DC circuit itself refers to the government citation of the listening post cases. And in fact, the circuit court actually sort of seems perplexed by the citation to those cases. And it actually says, none of the cases cited by the government relative to the listening post address the jurisdiction of the issuing court to authorize law enforcement officers to covertly place a listening device on private property. Basically, they're saying, we don't know why the government's citing listening post cases, because this isn't a Title III listening post case. And the court goes on to cite Ramirez and several other cases related to the listening post. And they say, whatever the merits of those decisions, they do not address the issue before us. So the Glover court itself limits its holding to its own set of facts, which revolve a covert trespass re-entry onto private property, which we simply do not have in this case. Moving on to Mr. Woods' argument with regard to Appellant Jerry Petit. It's important to keep in mind that Mr. Petit, nor any of the appellants, were ever charged with a substantive RICO violation. And the distinction is crucial. Had any of these appellants been charged with a substantive RICO violation, Mr. Woods would have had a point. Mr. Woods would have been correct that the government would have been required to prove that Mr. Petit himself actually committed two predicate racketeering acts, but that's not what we have here. And as Salinas points out, the difference between racketeering conspiracy and substantive RICO is that in a conspiracy, the government is not required to prove that each appellant committed personally two acts of racketeering. Rather, the government is only required to prove that the defendant or appellant agreed generally to conduct the affairs of that enterprise through the pattern of racketeering activity. So it matters not whether Mr. Petit himself committed two racketeering acts or whether he was simply in agreement that someone would commit two or more. And so Mr. Woods' distinction with regard to the acquittal of the one substantive predicate act is not particularly pertinent. Moving on to Mr. Roller's argument with regard to Mr. Robinson. As the court has correctly noted, Mr. Robinson's got some pretty bad evidence. Mr. Robinson was, of course, convicted of multiple Vicar murders and the government presented evidence of still other acts of violence in which Mr. He did, Your Honor. He was the sergeant at arms of the Southside chapter in Chicago. And I believe the evidence at trial indicated that at some point prior to the termination of the investigation, he actually was elevated to the rank of vice president of that chapter. So he did have actually, he actually occupied more than one role in the organization. And there were a number of witnesses who also interchanged the terms enforcer and sergeant at arms. So whether you refer to him as a sergeant at arms or an enforcer, he occupied all of those positions. Mr. Roller vehemently suggests that there was no evidence whatsoever that there was a robbery that was going to be committed on January the 2nd in Chicago at the Hawks Clubhouse. And once again, the government has set forth what it believes to be a fair recitation of the facts as they were presented at trial. Obviously, this court is obliged to view the light in the evidence most favorable to the jury's verdicts, in as much as this is a sufficiency of the evidence appeal. The government suggests that not only was there testimony about the display of numerous guns, Carl Davis, who was Mr. Irvin's friend, who did not testify that he saw a gun, did however testify that he saw a member of the Wheels of Soul brandish a knife at his friend Charles Irvin. That evidence and testimony is crucial because as the court is aware, one of the deceased in this case was actually a member of the Wheels of Soul whose name was Bryant Glass. He went by the nickname Faith. And it was subsequently determined that Faith was killed by a bullet that came from a gun that Mr. Robinson subsequently sold to the government's informant. The Wheels of Soul, when was that actually found that these people belonged to more than one organization over a period of time? No, Your Honor. The evidence at trial was that the Wheels of Soul has existed since about 1967, and the evidence further indicated that each one of these appellants belonged to this organization prior to the commission of the first predicate act that was presented at trial, the May 28th, 2009 shooting in Gary, Indiana. Many of them had been members of another organization prior to that. Many of them had been members of an organization called the Sin City Disciples. And that's important because when these appellants and others sort of en masse left the Sin City Disciples and joined the Wheels of Soul, testimony at trial suggested that that created problems between those two organizations. And it was very shortly after this sort of en masse migration from one organization to the other, that Mr. Petit shot a member of the Sin City Disciples who had refused to switch to the Wheels of Soul. That was the Gary, Indiana shooting. So the evidence at trial was that this is a very old organization that's been around for a very long time, and that all of these individuals had been members of the organization since before the predicate acts began. And on that note, I'm glad Your Honor raised that issue. One of the appellants, and I can't remember which one, I apologize, but cites to a case called American Honda for the proposition that it's sort of a mere association case. And the American Honda case is interesting but not helpful in the sense that in American Honda, which was actually a civil RICO case, the appellant in the American Honda case demonstrated that the evidence at trial had proven, and the government did not even dispute, that that individual did not even join the law firm that was at issue until after the predicate acts had occurred and had stopped. And so the case is factually distinct in a very large way from the case that we have here. What we have here is a number of individuals who joined this organization before any of the predicate acts that were presented at trial had occurred. And not only did they join that organization before the predicate acts occurred, but they maintained their membership during the entire time that the predicate acts were ongoing. Particularly with respect to Mr. Smith, I think that issue is important. Because while it's true that Mr. Smith did not himself commit a specific predicate racketeering act, it's also true that he was not charged with committing a specific predicate act, nor was he charged with conspiring to commit a specific predicate act. There's been a suggestion that the government's evidence as it pertained to Mr. Smith must fail because the government didn't prove that he had advanced knowledge that any of these specific predicate acts were going to occur. But that's not the standard. The standard isn't, did Mr. Smith know that this murder was going to happen on this date? Mr. Smith is not charged with conspiracy to commit any specific substantive predicate act. If he were, then certainly the government would have had to have proven that he had some managerial role or at least some advanced knowledge or participation in that specific predicate act. That wasn't what he was charged with. But doesn't Mr. Smith have a point in that it is sort of difficult to link up even his leadership and his edicts to even generally some of the acts that the others took part in? Actually, no, I don't think that's the case. And I'll point the court to a specific set of occurrences as quickly as I can without confusing everyone. But the testimony at trial was that on January 2nd of 2011, Mr. Robinson shot at a member of the street soldiers in an attempt to take his vest. And that in that incident, a member of the Wheels of Soul, Bryant Glass, was killed, as was a member of the Hawks. Almost immediately after that, well, two weeks after that, the entire Wheels of Soul nation convened in Philadelphia for a national meeting at which Mr. Smith presided. There was testimony at trial from a number of witnesses, including the government's informant and Alan Hunter, both of whom testified that at that meeting, Mr. Smith gave specific directives about who the Wheels of Soul was at war with. He named two organizations. Initially, he named one. He named the street soldiers. And he specifically referred to the incident that had occurred in Chicago. The testimony at trial was further that when the meeting concluded, members of the mother chapter of the Wheels of Soul provided three guns and a bulletproof vest to Walter Lee and Anthony Robinson and asked them to bring those guns to Chicago. And Walter Lee testified that the express purpose of those guns was that they were being provided by the mother chapter to the west side Chicago chapter for the specific purpose of retaliating against the street soldiers for the January 2nd, 2011 shooting. During the same meeting, there was testimony at trial that the members were notified that a shooting had occurred in Florida. That a member of the Wheels of Soul had been shot in the head by a member of a group called Outcast. And during that meeting, Mr. Smith indicated to his fellow members that the Wheels of Soul was at war with Outcast as a result of that shooting. Shortly after that, we hear recorded conversations where Dominic Henley speaks to Alan Hunter and he talks about his hatred of Outcast and how he doesn't want to have anything to do with Outcast. And 12 days after the national meeting in Philadelphia is when the incident happens in East St. Louis, where Mr. Elkins, Mr. Fry, Mr. Lee, and a number of others conspired to commit the murders of members of Outcast in East St. Louis. The government would submit that based upon the evidence, the jury could have reasonably inferred that that attempt on the lives or that conspiracy to commit the murders of members of Outcast in East St. Louis was in direct response to Mr. Smith's having instructed them some two weeks before that the Wheels of Soul was at war with Outcast. So I don't think that the relationship between Mr. Smith's conduct and the crimes of violence in this case were nearly as tenuous as Mr. Smith would have the court believe. What would you say the evidence shows is the common purpose linking these acts? As I understand it, there was no drug trafficking or extortion or any profit making. The common purpose linking the acts or linking the members of the, I'm sorry, I'm not sure that I understand. Well, the common purpose requirement in the case law, as I understand it, you argue that there was a common purpose of, well, what is your point? I'm not sure whether the court's referring to the common purpose element related to the existence of the enterprise or the same or similar purposes relative to the pattern of racketeering activity. If the court could clarify. Well, I think I'm referring to the enterprise. Okay. The evidence that the government admitted with respect to the common purpose element of the enterprise was simply that these were motorcycle enthusiasts. The government doesn't dispute that at all. And the government actually admitted evidence at trial that these people had a constitution, a written constitution. And in the written constitution, there is specific language that says the purpose of this club is to ride motorcycles and hang out and have a brotherhood and to advance the interests of the individual members. So to the extent that there was a common purpose, that's it. And that's not the government's words, those are the appellant's words. Those are the words within their own constitution. You say to the extent there was a common purpose, that was it. Doesn't the law require there be a common purpose? It does require that there be a common purpose, and that's it. And I think it was helpful to the government, obviously, that they were kind enough to actually write it down and spell it out for us. The common purpose is motorcycle enthusiasm. Correct. And not only that, but to enhance the interests of the individual members. And I think that's important. And it's not just to enhance the individual membership, as the testimony at trial amply demonstrated as testified to by Alan Hunter and others, that the purpose of this organization was they were a one percenter club. There was ample testimony about what a one percenter club means. There is ample testimony about what a one percenter club's role was in the motorcycle community. And a number of witnesses testified that as a one percenter club, that club had to maintain its position, had to exert its dominance, had to assert control over the entire motorcycle community in whatever location they were. So- Is that just for wheels of sole or for all groups? That applies to all one percenter motorcycle, outlaw motorcycle clubs. And again, a number of witnesses testified about what an outlaw club was. And we heard testimony by way of recorded conversation from Dominic Henley and others about what is an outlaw club. And one of the characteristics that was discussed a number of times over and over again was that if you are a one percenter club, you're the top of the food chain. The discussions about the bottom rockers, that's all that had to do with was who is going to assert control over the motorcycle community in that particular geographic area. To the extent that there's been a suggestion that the government's evidence failed to prove that there was an attempted armed robbery occurring on January 2nd of 2011, without belaboring the point or exhausting all of my remaining time, the government would simply invite the court's attention to the testimony at trial, not only of Charles Irvin and his friend Carl Davis, but also to the testimony of the two women that were eyewitnesses. Their testimony was, in the government's view, entirely consistent with Charles Irvin's and Carl Davis's in the sense that they described an altercation involving a number of Wheels of Soul members who had cornered Charles Irvin against the bar and were shouting things. And back and forth conversation was taking place that they characterized as an argument. To the extent that there's been some suggestion that it could not have been an armed robbery because Mr. Irvin didn't hear anybody say that they were going to steal his vest. Nowhere in any element of any of these offenses was the government required to prove that they announced their intentions. Certainly having a gun pointed at one's face or head or torso or any part of one's body and having knives displayed while demands are being made to remove one's vest. The jury certainly could have inferred from that testimony that this was in fact an attempt to relieve Mr. Irvin forcibly of his street soldier's vest. So to the extent that there has been a suggestion that it couldn't have been an armed robbery because they didn't say it was an armed robbery. That's simply not the law at all. I think I skipped over Mr. Pickett's argument with regard to the special verdict when Judge Colleton and I got into the discussion about the listening post, so I just want to refer back in my minute that I have remaining to the special verdict issue. The only thing I would mention with regard to the special verdict is that the appellants have not cited any case from any jurisdiction anywhere in which any circuit court of appeals has reversed a district court for failure to give a special verdict form in a racketeering conspiracy case, no matter how complex the facts. The fact of the matter is the government was simply not obligated to prove, and this is pursuant to Salinas and Glacier, not obligated to prove specific predicate acts. Rather, they were required only to prove the kinds of predicate acts. So the district court was well within her discretion to refuse to give the special verdict form that was requested by the appellants in this case. It is the government's view that it presented at trial through the course of 63 witnesses and six weeks of testimony. What was the government's objection to the special verdict form? The government's objection was simply that it imposed upon the government a burden that does not exist in the law. So you're saying it would have been an incorrect statement of the law to give the special verdict form? It certainly would have been contrary to the law as it's been decided by a number of federal circuits who have- No, I'm not saying whether you're saying the court was not required to give it. But there are other cases saying that in certain complex cases the court has discretion to give it. Correct. And I asked, well, what was your objection? And you said it would have been contrary to the law. It would have required you to prove something that you weren't required to prove, I think is what you said. It's the government's position that that would have imposed upon the government a burden that it is not required to meet pursuant to Salinas and Glacier. What burden? To prove which specific predicate acts each appellant agreed would be committed, as opposed to the types of predicate acts. Well, there could have been a special verdict form that was consistent with your view of that legal question. There could have been. And in fact, if I'm not mistaken, the government actually submitted during the course of the discussion about the special verdict, the government actually submitted a proposed special verdict form in the nature of what your honor is referring to. That set forth types of predicate acts as opposed to specific predicate acts. However, after further discussion and reviewing the case law, Judge Perry determined that she was not required to give a special verdict form and that she did not believe that under these circumstances it would be appropriate to give one. So had you asked for a general one and also submitted a special one? That is correct, your honor. Thank you. Thank you. Okay, Mr. Lynch. Thank you, your honor. I'll just go ahead and begin. My name is John Lynch, I represent Marshall Fry, and I've been chosen by the lottery to provide rebuttal by my colleagues today. I wanted to start out with a general statement. This case is novel in this circuit, judges. It's novel in a litany of contexts. And it's about expansion. It's about the government's request that they expand their authority under Title III. And it's about an expansion of territorial jurisdiction. And it's about an expansion of the RICO statute as applied to what is a very different type of organization with respect to these motorcycle enthusiasts. Well, yeah, but isn't there evidence that the Wheels of Soul was expanding too? Well, I think if that's a geographical expansion, again, membership is different from associating with one another versus whether or not they're associating with one another for the sole purpose of committing criminal acts. And that's what the Supreme Court dictates in this case. Sole purpose, you think sole purpose is required? Isn't there a distinguishing factor with respect to whether or not persons are merely associating with one another and one or more happens to commit a criminal act versus under RICO only associating with one another for the sole purpose of committing criminal acts in furtherance of that organization or enterprise. I think that's where the- What's your best case on sole purpose? I can give you, I think the Leisure is a poignant case. I think the Leisure case file is aligned with the historical analysis of organized crime in the United States. Because it involves the mafioso mob style culture where they had a defined purpose, usually to take over unions. They had a strict hierarchy. There was obvious communication between the mob leader, the godfather, so to speak, to the captains, lieutenants, and then the street soldiers. We don't have that in this particular case. What we have is a disjointed attempt by the government to attach every member of the Wheels of Soul across the United States into one RICO style enterprise. And I think that was the opposite was proven at trial, just with evidence of some of the other chapters. For example, Denver, Colorado, not being part and parcel of most, if not all of the government's case. The expansion point applies with respect to the electronic surveillance issue in this context. First, the government is manufacturing a listening post rule where it doesn't exist. It highlights the Luong, Ramirez, Denman, and Rodriguez cases in support of that. But if you looked at any of those four cases, there's not a listening post rule. Now, there's also a statute that's in place, Title III. There's not a listening post rule as articulated in that statute. There's not a listening post rule in the Rule of Criminal Procedure 41 as it partially implements Title III in various contexts. Congress has spoken with respect to whether or not there's a listening post rule. It's also salient to point out that 2518 provides an exception or a parenthetical. Where if it's a mobile listening device, perhaps the government should have put that in the application for Title III and submit it to the district court. So I think it's a misrepresentation of what the law is to suggest that now this court should create a listening post rule where one doesn't exist. Actually, the statute doesn't say mobile listening device, it says mobile interception device. I'm sorry, correct. But it's in the parenthetical to the statute, except for when there's a mobile interception device. What's your point? Do you think a cell phone is a mobile interception device or? I think it's ambiguous as to what that parenthetical is, and I think that's what the court in United States versus Giordino. And that's what Justice Silberman was addressing in the Glover case, is that there's an ambiguity there that needs to be addressed by the court. Which brings me into this Glover case. The Glover case is not so limited as the government represents to you all. I think Justice Silberman took great pains to articulate some of the overriding principles involving searches and seizures. There's constitutional issues here. Serious crimes involving a serious invasion of privacy. That's why Justice Silberman identified the Katz case, which says that a Title III search is still a search, and it's still subject to limitations. And so I posit this question, why are there limitations on Title III if we're not supposed to file those? Now the practical application in applying for a wiretap order in this district or anywhere else is the district court is only as good as the information provided to it by the US attorney, who in turn is only as good as the information provided to it by the agents in a particular case. I would note that in the district court's order, the target telephone is assumed by the district court to be in this district. The government should have gone to Illinois and done the traditional thing and obtained the judicial authorization to conduct Title III surveillance in Illinois. It certainly appeared in Illinois, it certainly had agents in Illinois, and I think that's important. Justice Calton, you mentioned, if I may real briefly, mentioned a good faith exception to what I will call technical defects in the Eighth Circuit. The Eighth Circuit does recognize technical defects in the application of warrants in a variety of contexts. But Justice Silberman suggests there's a huge issue with having a good faith exception where there are significant constitutional issues at play. And that's why he suggests it doesn't jive or align itself with the United States versus Giordino, and then also Jay Ginsburg and Sons. Your time is up. Thank you. Well, this is, I might say, a landmark type of case. Thank you all for your help with it. We'll move on then to the next case on the calendar. Miller v. Dugan. The next case for argument this morning is Miller versus Dugan.